# EXHIBIT A

*01006*
**Christopher L. Deininger, Esq., No. 004271996**
DEININGER & ASSOCIATES, LLP
415 Route 10, Suite 1
Randolph, New Jersey 07869
Attorneys for Plaintiff Marcia Lee

| | |
|---|---|
| MARCIA LEE,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED AIRLINES, INC.,  JANE DOE I-V (these names being fictitious as their present identities are unknown); JOHN DOE I-V (these names being fictitious as their present identities are unknown); XYZ CORPORATION I-V<br>(these names being fictitious as their present identities are unknown),<br><br>                    Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ESSEX COUNTY<br><br>DOCKET NO.:  ESX-L-_____<br><br>*Civil Action*<br><br>**COMPLAINT & JURY DEMAND** |

Plaintiff MARCIA LEE ("Lee" and/or "plaintiff"), by and through her attorneys DEININGER &

ASSOCIATES, LLP, as and for her Complaint against the defendants, says the following:

## NATURE OF ACTION & INTRODUCTION

1.     This is an action seeking equitable and legal relief for: (1) violations of the Conscientious

Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA"); (2) violations of the New Jersey Law Against

Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") (Gender and Race Discrimination, Religious

Discrimination & Retaliation); and (3) material contract breach.

2.     Lee is one of numerous present and form employees of defendant United Airlines, Inc.

("United") to have been subjected to patterns and practices within United through which Lee suffered

injury, harm, unlawful retaliation, harassment, and constructive discharge, for voicing objections, making

1

reports, and/or refusing to participate in, approve, authorize or condone, materially unsafe food preparation, processing, and storage practices, through which United intentionally, recklessly, and/or negligently disbursed food and food products containing life-threatening pathogen, to passengers flying into and/or out of Newark Liberty International Airport ("EWK Airport"), including but not limited to foods and food products which tested "positive" for listeria, which is generally known to cause sickness, ill health, death, fetal demise, and other serious, lift-threatening injury.

3.       United's mistreatment of Lee included acts of unlawful discrimination against her including but not limited to unlawful discrimination based upon Lee's disability, race, and religious beliefs.

4.       Up to and until the date upon which she was discharged constructively from United, Lee was party to a binding and enforceable employment contract with United formed when United recruited her to leave her job as a Senior Food and Drug Inspector for State of Massachusetts where among other duties she was commissioned by HHS to conduct contract inspections for the U.S. Government Food and Drug Administration (the "FDA").  United recruited Lee to join United based upon certain false, material misrepresentations concerning United's intention to address, cure, and resolve known food and food product processing and handling safety issues.

5.       Lee has suffered, and is continuing to suffer, serious and severe injury and harm including but not limited to career disruption, economic loss and emotional stress injury, all of which as were directly and/or proximately cause by the unlawful acts and omissions of United through its upper management employees, who knowing participated in causing harm and injury to Lee.

## JURISDICTION & VENUE

6.       Subject matter jurisdiction is vested in this Court because the claims and causes of action asserted herein arise under New Jersey law; are based upon acts and omission committed within the geographic boundaries of the State of New Jersey, committed by actors residing and/or doing business

2

within the geographic boundaries of the State of New Jersey.

7.      Personal jurisdiction is vested in this Court because the parties reside and/or do business within the geographic boundaries of the State of New Jersey.  Additionally, Plaintiff has satisfied all perquisites necessary to bring these claims.

8.      Venue is appropriate in this Court because Lee worked in Essex County, New Jersey, United has an office and does business in Essex County, New Jersey, and causes of action asserted herein occurred in Essex County, New Jersey.

## **PARTIES & OTHER ACTORS**

### **Facts Concerning Plaintiff Marcia Lee**

9.      Lee is a single mother who maintains her New Jersey residence in the city of West New York, New Jersey.  Lee was born in 1958 and is presently 60 years old.  Lee is a Caucasian of Eastern and Western European decent.  Lee's religious beliefs are Judeo Christian.

10.      Prior to her employment with United, Lee was a respected food safety professional with an established career in the field which included, but was not limited to, employment with State of Massachusetts Department of Public Health, Bureau of Environmental Health, Division of Food and Drugs as a Senior Food and Drug Inspector – a position which provided Lee with salary, compensation, benefits and insurance valued in excess of $120,000 per annum.

### **Facts Concerning Defendant United**

11.      United is a corporation organized and existing under the law of the State of Delaware, with office in New Jersey and numerous other states and locales, including offices at 233 S. Wacker Drive, Chicago, IL 60606.

12.      At all times relevant hereto, United has conducted and is continuing to conduct substantial business within the geographic boundaries of the State of New Jersey as a foreign corporation registered

with and authorized to do business in New Jersey.

13.     United is the world's third-largest commercial airline offering thousands of daily, commercial, domestic and internationally flights; generating revenue in excess of US$37,000,000,000 in 2017; owning assets valued in excess of US$42,000,000,000 in 2017; and employing, worldwide more than 86,000 people.

14.     United has a storied past of committing acts and omissions, both within and outside of the food service area of its operations, which were illegal, unlawful, and/or in violation of applicable law, rules, and regulations, and/or otherwise violated important public policies.

15.     For example, United was fined more than $2.4 millions in connection with charges brought against the company for committing bribery through the airlines establishment of the "*Chairman's Flight*" through which United curried favor with disgraced, former New Jersey /New York Port Authority Chairman David Samson, Esq.

16.     Turning to the area of food preparation and food safety, United has a significant track record of serious violations of federal, state, and local food health law, rules and regulations spanning many years.

17.     In or about October 2017, for example, United was operating a food preparation operation in Denver, Colorado under the d/b/a "Journey Cuisine," which facility was subjected to an extended shut down by the FDA after listeria was discovery not only in the food being prepared for passengers but also through the catering facility.

18.     FDA had issued a 483 violation notice to United dated February 1, 2017, based upon FDA inspections conducted between January 12 and February 1, 2016. The 483 violation notice documented the discoveries at United's "Journey Cuisine" Denver facility made despite United's effort to hide the problem by subjecting the facility to numerous, multi-day "deep cleanings" orchestrated by one or more United upper management employees who attempting to mislead the FDA by eliminating the filthy

4

conditions in the few days immediately before the FDA descended upon the United facility for an emergency inspection.

19.     Upon information and belief, United is considered by the FDA to be a bad actor when it comes to serious food safety violations causing or potentially causing sickness, death and significant harm to United's passengers.

20.     Referring exclusively to its business operations in New Jersey, upon information and belief, United conducts in excess of 400 daily flights into and out of EWK Airport; employs more than 1000 persons residing in New Jersey and/or reporting to work at facilities operated by United in New Jersey; generates tens-of-millions of dollars of revenue through its New Jersey business activities; and owns and/or stored tens-of-millions of dollars of assets in New Jersey.

21.     EWK Airport is one of United's largest international hubs and includes United's catering operations which is one of United's largest catering operation in its worldwide operation.  For purposes of this pleading, United's EWK Airport catering operations will be referenced, at times as "UA EWK Catering."

22.     At UA EWK Catering, United utilizes more than 1000 catering employees responsible for preparing more than 45,000, and 600 shelf stable, meals per day which are served by flight attendants to United passengers (including employees of the U.S. Military) on flights leaving from EWK Airport.

23.     Upon information and belief, there are numerous complaints presently pending against UA EWK Catering, including multiple complaints filed with the FDA and an OSHA complaint.

24.     UA EWK Catering was recently shuttered by local and regional officials based upon the discovery of conditions in violation of food safety laws, rules, codes, and/or regulations, conditions which created a significant risk of serious bodily harm, sickness, and potentially death, to workers in the facility as well as to United's passengers.  Upon information and belief, the conditions which resulted in the recent closure of UA EWK Catering including unsafe practices and conditions which existed during Lee's tenure

5

at United, and which resulted in Lee's constructive discharge from employment after she made appropriate reports of those conditions.

**Facts Concerning The Other Defendants**

25.     During the relevant time period, Jimmy Samartzis ("Samartzis") was United's *Vice President of Catering Operations* and was based out of United's corporate offices in Chicago.  Samartzis is a member of United's upper management.

26.     During the relevant time period, Hermès Pineda ("Pineda") was United's *Managing Director of HR & ER Field Operations* and was based out of United's corporate offices in Chicago.  Pineda is a member of United's upper management.

27.     Commencing in or about October 2016 and continuing thereafter through to the date of this pleading, Alisia Atwater ("Atwater") was United's *Director of Regulatory Compliance – Food Safety* and was based out of United's offices in Chicago.  Atwater is a member of United's upper management.

28.     Upon information and belief, Atwater is also a religious person who looks down upon, and discriminates against, persons whom she believes "need religion," "need Jesus," and/or otherwise fail in her mind to have religious or spiritual beliefs aligned with those she holds.

29.     Upon information and belief, Atwater also is a homophobe who looks down upon, and discriminates against, persons whom she perceived (rightly or wrongly) to be gay and/or otherwise having a non-traditional sexual orientation.

30.     Upon information and belief, based upon her belief that Moya and Mosby were homosexuals, Atwater unlawfully discriminated and retaliated against each of them, with the knowledge and support of United's other upper management employees, including but not limited to Samartzis and Pineda.

31.     At relevant times hereto, Samartzis, Pineda, and Atwater were and remained senior management level employees who controlled Lee's workplace and supervise Lee.  They each: (1) aided United in performing a wrongful act that caused Plaintiff to suffer injuries; (2) were generally aware of their role as part of an illegal or tortious activity at the time they provided assistance; and (3) knowingly and substantially assisted United in the principal violation of the statutes referenced in this Complaint.

32.     During the relevant time period, JOHN DOES I-V and JANES DOES I-V are currently unknown employees who were either senior management level employees who controlled Plaintiff's workplace and supervised Plaintiff and aided and/or abetted in the commission of conduct complained of in this Complaint and/or who acted within the scope of their employment at the workplace, or, to the extent they went beyond the scope of their employment, Defendants ratified, embraced and added to their conduct. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

33.     During the relevant time period, XYZ Corporations I-V were unknown affiliated corporations or entities or other corporations who have liability for the claims set forth in this Complaint. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual entities by name.

34.     All defendants are thus subject to suit under the statutes pled above.

35.     At all times referenced in this Complaint, employees of the individual defendants referred to in this Complaint were acting within the scope of their respective employment or the Corporate Defendant(s) ratified, embraced and added to their conduct to the extent that their actions went beyond the scope of their employment.

**Other Actors Relevant to This Dispute**

36.     Commencing in or about February 2017 and continuing at all times relevant hereto, Eliot

R. Mosby ("Mosby") was hired by as its *Managing Director – GM Catering Operation (EWK and EWR)*.

37.     Upon information and belief, Mosby is a resident of Wood Ridge, New Jersey who, like Lee, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result, and who suffered unlawful discrimination by United, including retaliation in the form of being stripped of job duties and being transferred to Chicago – away from the food safety problems existing at UA EWK Catering.

38.     On Friday September 9, 2018, Mosby commenced a plenary action in this Court against United, Samartzis, Pineda and others, asserting claims and causes of action under CEPA and the LAD (the "Mosby Lawsuit").

39.     Upon information and belief, the transactions and occurrences alleged in the Mosby Lawsuit are substantially similar to, and overlapping with, those alleged here.

40.     Commencing in or about June 2016, Gustavo A. Moya, Jr. ("Moya"), was hired by United as a *Training Manager* employed at UA EWK Catering and, thereafter, was promoted to *Level 4 Food Safety Manager*.

41.     Upon information and belief, prior to the time when he began experiencing unlawful discrimination and retaliation at United, Moya was considered to be a highly-valued United employee who routinely achieve the highest personnel review ratings, in sum and substance, of "meets expectations" and/or "exceeds expectations."

42.     Moya also was the most-knowledgeable, most-competent food safety manager at UA EWK Catering, a fact which was apparent to Plaintiff through her professional interactions with Moya both before and during her employment with United.

43.     Moya is a resident of West New York, New Jersey who, like Lee and Mosby, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a

result, and who suffered unlawful discrimination by United, including retaliation in the form of being stripped of job duties and being told that he was being transferred to Chicago – away from the food safety problems existing at UA EWK Catering.

44.     Upon information and belief, at times relevant to this Complaint, Mike Landers ("Landers") was employed by United as its *Managing Director Global Catering Operations*, which included responsibility for UA EWK Catering.  Upon information and belief, Landers is a resident of Indiana who, like Lee, Mosby and Moya, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result.

## FACTUAL ALLEGATIONS

45.     Plaintiff was a respected public sector employee who worked supervising food safety inspections and food safety compliance in various industries, including the airline industry.  Plaintiff was happily employed with the State of Massachusetts, was receiving a compensation and benefits package she valued, and enjoyed the stability of her career to support herself and her daughter as a single mother.

46.     In or about December 2016, Plaintiff was assigned by to oversee food safety issues involving United, including but not limited to United's catering operations at UA EWK Catering.

47.     During and in connection with that public sector assignment, Plaintiff discovered numerous food safety issues which needed to be addressed and remedied by United, as quickly as possible, in order to avoid the risk of potential food poisoning likely to be caused to United passengers.

48.     Plaintiff made her concerns known to United by reporting them to United's responsible management employee(s), and reported the issues as well to her employer, in order to protect the flying public from actual or potential food safety harm.

49.     United appeared to respond positively to Plaintiff's efforts to guide United into compliance with federal, state and local mandated food safety practices and sought to hire Plaintiff as a

United employee for purposes of effectuating compliance.

50.     United represented to Plaintiff that United had a sincere interest in curing its food safety non-compliance issues and represented to Plaintiff that if she took United's employment offer, Plaintiff would become a key member of United's team to identify, correct, and resolve food safety issues, including particularly the food safety issues impacting UA EWK Catering.

51.     Upon information and belief, at the time United was making those representations to Plaintiff, United knew that those representations were materially false, misleading, and were being made to Plaintiff for the purpose of inducing her reliance in making her decision to become an employee of United.

52.     But for those representations from United, which Plaintiff materially and reasonably relied upon as truthful, Plaintiff would not have resigned from her public sector employment to join United.

53.     Based upon United's promises and representations to her, Plaintiff resigned from her public sector employment and accepted United's offer to become United's *Senior Manager of Food Safety* effective March 22, 2017.

54.     In connection with that employment, United agreed to provide Plaintiff with the following compensation and benefits:  (1) about $3,000 per week in salary; (2) Restricted Stock grants; (3) a 401K with employer matching contributions; (4) annual bonus payouts; (5) high-end healthcare insurance benefits; (6) lifetime flight benefits for herself, her parents and her daughter; and (7) other valuable benefits, perks, and compensation.

55.     Immediately prior to the time she was hired by United, Plaintiff was a highly respected public sector food safety inspector. She left a comfortable home, lifestyle and stable career in Massachusetts to accept United's offer to serve as United's *Senior Manager of Food Safety* at the UA EWK Catering operation.

56.     When United recruited Plaintiff to join United, no one disclosed to Plaintiff that United was materially resistant to adopting and maintaining safe food processing and safe food handling practices, and/or that United was materially resistant to achieving good faith compliance with applicable federal, state, and local laws, codes, rules, and regulations including compliance with FDA reporting requirements.

57.     Throughout her association with United, Plaintiff disclosed to United (including Atwater) conditions, practices, and circumstances within UA EWK Catering that Plaintiff reasonably believed to be violations of applicable federal, state and/or local food safety law, rules, codes, and/or regulations.

**The Jyoti Incident**

58.     For example, in or about February 2017, at or about the time when Mosby joined United, during routine product food safety sampling at UA EWK Catering, sample results tested by an independent lab came back unsatisfactory for food safety purposes for one of United's key outside prepared-meal vendors, Jyoti Natural Foods, Inc. ("Jyoti").

59.     Together with Moya, Plaintiff (at the time not yet hired by United) inspected the facility at issue and provided United with guidance as to the material manner in which the facility was in violation of food safety law, rules, codes, regulations, and/or standards because it was unsanitary, improperly equipped, and unable to operate in compliance due to unfinished facilities renovation / construction.

60.     The issues identified by Moya and Plaintiff demonstrated a material possibility that unsafe food from Jyoti, contaminated with harmful, potentially fatal bacteria, could imminently be placed into the food supply chain for United's passengers flying out of Newark.

61.     Upon information and belief, Moya reported the problem to Atwater and/or others in upper management at United, whereupon Atwater was resistant to taking corrective action despite the serious food safety risks presented.

62.     In violation of the spirit if not also the letter of food safety law, rules, codes, regulations

11

and/or safe practices, Atwater initiated a plan to disguise and/or hide the material food safety risks at risk the issue by alerting Jyoti to the fact that Moya was being sent over to conduct swabbing of microbiological niches, so that Jyoti could attempt to deep clean the facility to obscure unsafe food handling conditions.

63.     Upon information and belief, prior to Moya's arrival at Jyoti for that second round of sampling, Atwater advised Jyoti that Moya was coming for the purpose of enabling Jyoti could clean the facility with bleach before Moya arrived, in an effort to hide the problematic unsanitary and unsafe conditions impacting the food was providing to United.

64.     Upon information and belief, based upon his discovery during the second inspection at Jyoti that Jyoti had undertaken efforts to disguise and/or hide its food safety problems from Moya by destroying evidence through the bleach cleaning, and his ongoing concerns that Jyoti's unsanitary and unsafe practices threatened to cause serious harm to United's passengers, Moya determined that it was necessary for United to terminate its vendor-vendee relationship with Jyoti.

65.     Upon information and belief, when Moya proceeded with the termination of Jyoti, Atwater actively interfered with the termination and sought to block it from occurring, in contradiction to the best interests of United's passengers likely to suffer food poisoning from if/when tainted Jyoti food was served on United flights.

66.     Upon information and belief, ultimately Jyoti's vendor-vendee relationship with United was terminated due to Moya's efforts, despite Atwater's reckless and improper efforts to stop that from occurring.

67.      In advance of Plaintiff's decision to come to work for United, United intentionally failed to disclose those relevant facts to Plaintiff due to its graphic demonstration that United's intentions as to food safety were disingenuous and not aligned with those of Plaintiff, aligned with the representations United made to Plaintiff for purposes of soliciting her to join United as an employee, and/or aligned with what applicable law, rules, codes, and/or regulations required of United meal service to passengers.

68.     Had United truthfully disclosed to Plaintiff the facts and circumstances of the Jyoti incident, the 2016 Denver, Colorado "Journey Cuisine" incident, and United's true intentions regarding food safety, Plaintiff would not have accepted employment with United; would never have started the relocation process; and, instead, would have continued her successful public sector employment.

**Lee's Employment With United**

69.     Upon Plaintiff's commencement of employment with United on March 22, 2017, Plaintiff was assigned to work under Atwater (Plaintiff's supervisor) and to work with Moya for the purported purpose of identifying and resolving United's food safety compliance issues.

70.     Initially, Atwater repeatedly professed to Plaintiff that Plaintiff was a "valued member" on the United team, and that United was lucky to have Plaintiff in it employ.  Atwater praised Plaintiff for the work Plaintiff was performing as a United employee, including but not limited to work Plaintiff performed which impacted UA EWK Catering.

71.     Atwater's attitude towards Plaintiff materially changed, however, when Plaintiff declined to participate in activities involving unlawful discrimination against Moya based upon Atwater's perception that he was "gay."

72.     Plaintiff was involved in a meeting with Atwater and Moya in or about March 2, 2017, in New Jersey to discuss UA EWK Catering and its food safety issues, which were material.

73.     After Moya was excused from the meeting, Atwater continued to meet with Plaintiff during which meeting Atwater advised Plaintiff, in expressed language, that Atwater did not approve of Moya's homosexual "lifestyle"; and communicated to Plaintiff that she (Atwater) took exception to what she perceived to be Moya's flamboyant personality.

74.     Thereafter, in another meeting with Atwater, in reference to Moya's sexual orientation, Atwater advised Plaintiff of Atwater's opinion that Moya needed to "find God" and/or "find Jesus",

referencing Atwater's belief that God could cure Moya of his sexual orientation, and that Moya was a sinner due to his sexual orientation.

75.      Atwater instructed Plaintiff to fire Moya.

76.      Plaintiff refused based upon Plaintiff's perception that Moya was a highly-valued United employee and was United's most knowledgeable food safety manager for regulatory compliance at UA EWK Catering.

77.      In connection with Plaintiff's employee-personnel review of Moya, Atwater directed Plaintiff to purposefully deflate her ratings of Moya by reporting, in sum and substance, that Moya "failed to meet expectations."

78.      Plaintiff refused based upon Plaintiff's perception that Moya's job performance easily qualified at the level of "meets expectations," if not higher.

79.      Plaintiff perceived that Atwater was directing Plaintiff to single out and mistreat Moya, in connection with his United employment, due to his sexual orientation as well as his reports of food safety violations occurring at UA EWK Catering, including but not limited to the Jyoti incident.  Based upon those perceptions, in a meeting in which they were discussing Moya, Plaintiff communicated to Atwater that Plaintiff would not engage in such behaviors, whereupon Atwater became belligerent and screamed at Plaintiff for her refusal to engage in those unlawful actions.

80.      Thereafter, in another meeting with Atwater, Plaintiff advised Atwater that United needed to stop using food-vendor-sources (like Jyoti) with adverse observations (e.g. unsanitary or inappropriate condition, and/or positive tests for food-borne pathogen) made during or as a result of inspections United conducted.

81.      Atwater rejected Plaintiff's suggestion, advising Plaintiff in sum and substance that Plaintiff should not perform her food safety job duties in a manner that exposed United to criticism or potential operational disruption, regardless of the health risks that might present to United's passengers.

14

82.     Atwater then commenced unlawful retaliation against Plaintiff, for the intended purpose of forcing Plaintiff out of her job at United through constructive discharge.

83.     For example, Atwater required Plaintiff to commence an immediate inspection tour of United food catering operations throughout the United States, knowing that many of the subject operations could have been monitored by other means and the inspections were unnecessary at the time.

84.     Upon information and belief, Atwater direction to Plaintiff to do that was purposeful harassment intended by Atwater to impose physical challenges upon Plaintiff that would likely cause her emotional stress and exacerbate physical limitations and disabilities which Atwater knew Plaintiff to be suffering from.

85.     Atwaters's plan to harass Plaintiff in that manner had its intended impact upon Plaintiff's health and well-being.  Atwater's forced-march-exhaustion-schedule imposed upon Plaintiff resulting in Plaintiff having to be hospitalized on or about June 29, 2017, when Plaintiff was treated for spiking blood pressure and physical exhaustion due to Atwater's harassment.

86.     During her inspection of United's catering operation in Denver, Colorado, Plaintiff discover materially improper food safety practices which created a serious, imminent risk of an outbreak of listeria monocytogenes, which can be deadly.

87.     Plaintiff reported the problem to Atwater and others within United, whereupon Atwater criticized Plaintiff for making the report telling Plaintiff that she was "not corporate minded enough" due to Plaintiff's efforts to secure United's compliance, at the Denver facility, with the applicable federal, state, and local laws, rules, codes, and regulations United was violating that caused those unsafe conditions to occur and persist, uncorrected.

88.     Rather than take the required, appropriate corrective action, Atwater did not proceed with any action until recurring positive listeria monocytogenes testing occurred resulting in United's need for disclosure to FDA expired, at which time, she had United engage in an effort to cover-up the horrific

15

conditions existing at the Denver facility by having that facility engage in a "deep cleaning" immediately prior to the FDA's anticipated emergency health inspection of the facility.

89.      Upon information and belief, Atwater's "deep cleaning" was undertaken for the purpose of hiding the food safety issues from the FDA and to unlawfully mislead the FDA regarding the unsafe conditions existing and persisting at the Denver Facility.

90.      When the FDA performed its inspection, United's Denver facility was closed down due to unsafe food conditions and, thereafter, the facility remained closed for many months while United was forced by the FDA to take corrective action in line with that which Plaintiff had reported to United to be required.

91.      Due to Plaintiff's reports of unsafe conditions, unlawful practices, and other matters of serious public policy concern, Atwater sought to force Plaintiff to immediately transfer to United's offices in Chicago (hereinafter, the "Chicago Transfer Harassment").

92.      United has a pattern and practice of retaliation against and harassment of responsible employees like Plaintiff, Mosby, and Moya, through the Chicago Transfer Harassment.

93.      United's practice through the Chicago Transfer Harassment is to effectively strip the employee of their original, legitimate job duties and responsibilities resulting in reports requiring corrective action; reassigning the employee to report to a building in Chicago without any assignment to an office or work area commensurate with the employee's pre-transfer assignment; pepper the employee with demeaning, make-work assignments; and isolate the employee away from family and friends they would see on a daily basis before the transfer went into effect.

94.      Upon information and belief, United recently utilized the Chicago Transfer Harassment against Mosby; is in the process of attempting to utilize the practice in connection with Moya; and was attempting to force Plaintiff to be transferred in that manner in retaliation for Plaintiff's lawful, protected, conduct and reports.

95.     In fact, pursuant to United's published employee personnel policies, Plaintiff was allowed one-year to organize and effectuate her transfer to Chicago, and Atwater was unlawfully harassing Plaintiff for Plaintiff's proper failure to immediately relocate, which Plaintiff was unable to do because of family issues (her daughter in school) and financial constraints (unable to sell her house in Massachusetts).

96.     As of August 2017, still operating under the Atwater forced-march-exhaustion-schedule, Plaintiff and Atwater met in Houston, Texas, where United had a food service catering operation impacted by Hurricane Harvey (the "Houston Facility").

97.     Plaintiff had discovered and reported to Atwater and others in United's upper management serious, unlawful food safety issues impacting the Houston Facility.

98.     In response to those reports, Atwater falsely accused Plaintiff is driving cars without any valid driver's license and threatened that United would continue to "investigate" Plaintiff.  Upon information and belief, that investigation by United was for the purpose of digging up dirt and serious wrongful conduct about Plaintiff that United could utilize against her, in retaliation for Plaintiff's protected acts and conduct.

99.     United created and imposed a hostile work environment upon Plaintiff, in violation of Plaintiff's protected rights and interests under the LAD and under CEPA by and through: (a) the forced-march-exhaustion-schedule; (b) pressuring Plaintiff to relocate immediately in violation of United's published policies; (c) withhold significant monies due and owed to Plaintiff for reimbursement of company travel expense for the purpose of imposing financial hardship upon Plaintiff, a single mother; (d) investigating Plaintiff for the purpose of digging dirt and making fabricated allegations against her of improper employee conduct; and (e) other actions and omission directed at Plaintiff unlawfully.

100.     In late August 2017, upon arriving in Maine for a break from the Atwater forced-march-exhaustion-schedule, Plaintiff was presented with a lab report demonstrating a positive listeria species in the food at UA EWK Catering.

17

101.     As she was required to do under applicable FDA regulations, Plaintiff immediately checked to make sure that her senior food safety manager (Moya) had sent it out the positive sample for verification, which Moya confirmed he had done.

102.     As she was required to do under applicable FDA regulations, Plaintiff then immediately commenced working with Moya to put the potentially tainted food products "on hold" so that they would not be disbursed into the food chain given to United's passengers flying out of Newark.

103.     Moya created a global internal United alert and, as required under applicable FDA regulation, sent the alert out within United to keep the tainted food out of the food supply unless and until the proper testing was completed to avoid a possible outbreak of listeria monocytogenes, which can be deadly.

104.     United's upper management resisted keeping the food on hold due to business concerns, and advised Plaintiff, in sum and substance, that United was going to delay making mandatory reports to the FDA concerning the situation.

105.     Plaintiff advised United that the failure to immediately make those reports was a serious violation of applicable federal, state, and local laws, regulations, codes, and rules.

106.     As United's Senior Manager of Food Safety, Plaintiff faced serious, significant, criminal and civil liability exposure if United's failure to make those timely reports to the FDA resulted in infecting United passenger with a food borne pathogen.

107.     Atwater directed Plaintiff to stand down and directed Plaintiff that she could not make the necessary report to the FDA immediately.

108.     United was fully aware of the situation and was choosing, intentionally, to violate FDA regulations and needlessly put passengers at risk of serious harm and, potentially, even death.

109.     United was aware that if Plaintiff permitted that to occur, Plaintiff would be committing what amounted to a criminal omission, at risking jail and fines  under the *Park Doctrine*, imposed by United

18

States v. Park, 421 U.S. 658 (1975).

110.    By and through its refusal to take the required corrective action immediately, United was forcing Plaintiff to either participate in serious criminal and/or civil wrongdoing, or to resign involuntarily.

111.    United's acts and omissions through Atwater and the other upper-management employees involved, were unlawful, improper, in violation of Plaintiff's protected rights and interests, and committed intentionally, in bad faith.

112.    Plaintiff was then forced to tender her resignation, effective immediately.

113.    On September 11, 2017, at a meeting held in Newark, New Jersey, United advised Plaintiff that her involuntary resignation was accepted by United; that Plaintiff's last day on the job would be September 11, 2017, and that Plaintiff's employment would terminate effect on or about September 25, 2017, the last day she would be paid by United.

114.    Effective on or about September 26, 2017, Plaintiff became involuntarily unemployed, leaving Plaintiff injury emotionally, professionally, and financially.  Since that time, Plaintiff's efforts to find equivalent employment have been unsuccessful, and Plaintiff has been seriously constrained in her ability to financially support herself and her daughter.

115.    In or about August 2018, due to United's continuing intentional failure and refusal to correct food safety violations at UA EWK Catering (where the listeria was found and reported to Plaintiff a year earlier), local health department officials shuttered UA EWK Catering due to numerous, improper, harmful food safety practices, facilities issues, and compliance failures by United.

116.    As a direct and proximate result and consequence of the defendants' wrongful and unlawful acts, actions and omissions which resulted in the involuntary termination of Plaintiff's employment as of September 2017, Plaintiff has suffered and is continuing to suffer serious emotional distress, related physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for herself, her parents, and her dependents), loss of

insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

## FIRST COUNT

### (New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.)

117.     Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

118.     Plaintiff complained about, objected to and refused to participate in illegal and unethical conduct by Defendants.

119.     Plaintiff reported the substandard and unsafe food safety conditions and participated in her coworkers' disclosure of those unlawful and illegal acts and omissions to appropriate regulatory authorities, including but not limited to the FDA.

120.     Thereafter, defendants retaliated against Plaintiff because of her valid complaints of illegal and unethical conduct and refusal to participate in such illegal and unethical conduct, including but not limited to all of the forms of unlawful retaliation stated previously in this pleading.

121.     As a direct and proximate result of the acts and omissions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy her life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

122.     Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

## SECOND COUNT

### (New Jersey Law Against Discrimination)

123.    Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

124.    Plaintiff is a member of several protected classes under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") based upon her race, disabilities, and religious faith and upbringing.

125.    Defendant United Airlines is an "employer" as defined under the LAD.

126.    Plaintiff was harassed as a result of her protected statuses and/or perceived protected statuses.

127.    For example, when Atwater learned that Plaintiff was mixed Jewish-Catholic in her religious heritage and orientation, and that Plaintiff was observant of significant religious holidays for both of those faiths, Atwater expressed distain and contempt towards Plaintiff and directed mistreatment

at Plaintiff for her observance of Jewish traditions, holidays, and faith.

128.    On numerous occasions Atwater chided Plaintiff that she (Plaintiff) "needed Jesus," and intruded into Plaintiff's privacy by questioning Plaintiff about her attendance at church.

129.    Atwater was informed that Plaintiff suffered from dyslexia, back injuries, high blood pressure, and stress; rather than provide Plaintiff with the reasonable accommodations she requested, Atwater intentionally pressured Plaintiff with unreasonable travel and other unnecessary work-related demands for purposes of exacerbating Plaintiff's conditions so Plaintiff would be forced to resign from United.

130.    Atwater, who was African-American, openly and publicly characterized herself as a person suffering from "angry black woman syndrome" and routinely evidenced unlawful contempt towards Plaintiff based upon the fact that Plaintiff is not African-American.

131.    Upon information and belief, as of April 2017 United received numerous reports identifying acts by Atwater which were inappropriate, improper, and/or unlawful under the LAD, Title VII and/or other civil rights laws, rules and regulations.

132.    Upon information and belief, through its upper management, as of April 2017 United knew of Atwater's predisposition to acting in a discriminatory manner; of her predisposition to make insensitive and inappropriate remarks to and about people concerning their protected characteristics; and of her particular insensitivity to persons she perceived to be less religious than herself, based upon the other persons faith, lifestyle, sexual identity and/or sexual orientation.

133.    United failed to take appropriate corrective action as to Atwater, instead permitting her to continue with her unlawful, upper management conduct in violation of the LAD.

134.    In violation of their obligations under LAD, Defendants' Human Resources staff failed to take appropriate action to protect Plaintiff, to discipline the other defendants, and/or other unlawful acts and omissions.

22

135.    The foregoing facts and circumstances demonstrate that the defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by discriminating against Plaintiff.

136.    As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy her life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

137.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

## THIRD COUNT

### (New Jersey Law Against Discrimination - Retaliation)

138.    Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

139.    The foregoing facts and circumstances demonstrate that defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by retaliating against Plaintiff for engaging in the protected activity of refusing to take inappropriate employment action against Moya.

140.    As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy her life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

141.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

## FOURTH COUNT

### (Material Contract Breach)

142.  Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

143.  Plaintiff and United were parties to a binding employment agreement, supported by good and valuable consideration (the "Agreement").

144.  The Agreement included an obligation that United render its contractual performance in good faith, and in a manner that would neither interfere, hamper, or deny Plaintiff the performances she bargained to receive.

145.  Plaintiff rendered material performance of any and all obligations she had under the Agreement, and had discharged or otherwise satisfied any and all conditions precedent to her entitlement to United's full and complete, good faith performances under the Agreement.

146.  United material breached the Agreement by and through its acts and omissions, including but not limited to the following: (a) United forced Plaintiff to involuntarily resign from employment with United; (b) United unlawfully harassed, retaliated against, and discriminated against Plaintiff for purposes of interfering with, hampering, and/or denying Plaintiff the performances she bargained to receive.

147.  As a direct and proximate result and consequence of the defendants' wrongful and unlawful acts, actions and omissions which resulted in the involuntary termination of Plaintiff's employment as of September 2017, Plaintiff has suffered and is continuing to suffer serious emotional distress, related

physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for herself, her parents, and her dependents), loss of insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

**WHEREFORE**, as to each and every count, Plaintiff demands judgment on each and all of these Counts against each and every one of the defendants, jointly and severally, as follows:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Marcia Lee

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 10, 2018

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Marcia Lee

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 10, 2018

## DESIGNATION OF TRIAL COUNSEL

Please take notice that pursuant to R. 4:25-4, Christopher L. Deininger, Esq. is

hereby designated as trial counsel in the within matter.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Marcia Lee

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 10, 2018

*01006*
**Christopher L. Deininger, Esq., No. 004271996**
DEININGER & ASSOCIATES, LLP
415 Route 10, Suite 1
Randolph, New Jersey 07869
Attorneys for Plaintiff Marcia Lee

| | |
|---|---|
| MARCIA LEE,<br><br>                           Plaintiff,<br><br>        v.<br><br>UNITED AIRLINES, INC.,  JANE DOE I-V (these names being fictitious as their present identities are unknown); JOHN DOE I-V (these names being fictitious as their present identities are unknown); XYZ CORPORATION I-V (these names being fictitious as their present identities are unknown),<br><br>                         Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, ESSEX COUNTY<br><br>DOCKET NO.:  ESX-L-006386-18<br><br>*Civil Action*<br><br>***FIRST AMENDED & CORRECTED COMPLAINT & JURY DEMAND*** |

      Plaintiff MARCIA LEE ("Lee" and/or "plaintiff"), by and through her attorneys DEININGER & ASSOCIATES, LLP, as and for her Complaint against the defendants, says the following:

### <u>NATURE OF ACTION & INTRODUCTION</u>

      1.        This is an action seeking equitable and legal relief for: (1) violations of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. ("CEPA"); (2) violations of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") (Gender and Race Discrimination, Religious Discrimination & Retaliation); and (3) material contract breach.

      2.        Lee is one of numerous present and form employees of defendant United Airlines, Inc. ("United") to have been subjected to patterns and practices within United through which Lee suffered

injury, harm, unlawful retaliation, harassment, and constructive discharge, for voicing objections, making reports, and/or refusing to participate in, approve, authorize or condone, materially unsafe food preparation, processing, and storage practices, through which United intentionally, recklessly, and/or negligently disbursed food and food products containing life-threatening pathogens, to passengers flying into and/or out of Newark Liberty International Airport ("EWK Airport"), including but not limited to foods and food products which tested "positive" for listeria, which is generally known to cause sickness, ill health, death, fetal demise, and other serious, life-threatening injury.

3.      United's mistreatment of Lee included acts of unlawful discrimination against her including but not limited to unlawful discrimination based upon Lee's disability, race, and religious beliefs.

4.      Up to and until the date upon which she was discharged constructively from United, Lee was party to a binding and enforceable employment contract with United formed when United recruited her to leave her job as a Senior Food and Drug Inspector for State of Massachusetts where among other duties she was commissioned by HHS to conduct contract inspections for the U.S. Government Food and Drug Administration (the "FDA").  United recruited Lee to join United based upon certain false, material misrepresentations concerning United's intention to address, cure, and resolve known food and food product processing and handling safety issues.

5.      Lee has suffered, and is continuing to suffer, serious and severe injury and harm including but not limited to career disruption, economic loss and emotional stress injury, all of which as were directly and/or proximately cause by the unlawful acts and omissions of United through its upper management employees, who knowingly participated in causing harm and injury to Lee.

## JURISDICTION & VENUE

6.      Subject matter jurisdiction is vested in this Court because the claims and causes of action asserted herein arise under New Jersey law, are based upon acts and omission committed within the

2

geographic boundaries of the State of New Jersey, committed by actors residing and/or doing business within the geographic boundaries of the State of New Jersey.

7.      Personal jurisdiction is vested in this Court because the parties reside and/or do business within the geographic boundaries of the State of New Jersey.  Additionally, Plaintiff has satisfied all perquisites necessary to bring these claims.

8.      Venue is appropriate in this Court because Lee worked in Essex County, New Jersey, United has an office and does business in Essex County, New Jersey, and causes of action asserted herein occurred in Essex County, New Jersey.

## PARTIES & OTHER ACTORS

### Facts Concerning Plaintiff Marcia Lee

9.      Lee is a single mother who maintains her New Jersey residence in the city of West New York, New Jersey.  Lee was born in 1958 and is presently 60 years old.  Lee is a Caucasian of Eastern and Western European decent.  Lee's religious beliefs are Judeo Christian.

10.      Prior to her employment with United, Lee was a respected food safety professional with an established career in the field which included, but was not limited to, employment with State of Massachusetts Department of Public Health, Bureau of Environmental Health, Division of Food and Drugs as a Senior Food and Drug Inspector – a position which provided Lee with salary, compensation, benefits and insurance valued in excess of $120,000 per annum.

### Facts Concerning Defendant United

11.      United is a corporation organized and existing under the law of the State of Delaware, with offices in New Jersey and numerous other states and locales, including offices at 233 S. Wacker Drive, Chicago, IL 60606.

12.      At all times relevant hereto, United has conducted and is continuing to conduct substantial

business within the geographic boundaries of the State of New Jersey as a foreign corporation registered with and authorized to do business by the State of New Jersey.

13.     United is the world's third-largest commercial airline offering thousands of daily, commercial, domestic and internationally flights; generating revenue in excess of US$37,000,000,000 in 2017; owning assets valued in excess of US$42,000,000,000 in 2017; and employing, worldwide more than 86,000 people.

14.     United has a storied past of committing acts and omissions, both within and outside of the food service area of its operations, which were illegal, unlawful, and/or in violation of applicable law, rules, and regulations, and/or otherwise violated important public policies.

15.     For example, United was fined more than $2.4 millions in connection with charges brought against the company for committing bribery through the airlines establishment of the "*Chairman's Flight*" through which United curried favor with disgraced, former New Jersey /New York Port Authority Chairman, David Samson, Esq.

16.     Turning to the area of food preparation and food safety, United has a significant track record of serious violations of federal, state, and local food health law, rules and regulations spanning many years.

17.     In or about October 2017, for example, United was operating a food preparation operation in Denver, Colorado under the d/b/a "Journey Cuisine," which facility was subjected to an extended shut down by the FDA after listeria was discovery not only in the food being prepared for passengers but also throughout other areas of the catering facility.

18.     FDA had issued a 483 violation notice to United dated February 1, 2017, based upon FDA inspections conducted between January 12 and February 1, 2016. The 483 violation notice documented the discoveries at United's "Journey Cuisine" Denver facility made despite United's effort to hide the problem by subjecting the facility to numerous, multi-day "deep cleanings" orchestrated by one

or more United upper management employees who attempting to mislead the FDA by eliminating the filthy conditions in the few days immediately before the FDA descended upon the United facility for an emergency inspection.  Nevertheless, the FDA shut down the facility, confirming that Lee had been correct to advise its closure.

19.     Upon information and belief, United is considered by the FDA to be a bad actor when it comes to serious food safety violations causing or potentially causing sickness, death and significant harm to United's passengers.

20.     Referring exclusively to its business operations in New Jersey, upon information and belief, United conducts in excess of 400 daily flights into and out of EWK Airport; employs more than 1000 persons residing in New Jersey and/or reporting to work at facilities operated by United in New Jersey; generates tens-of-millions of dollars of revenue through its New Jersey business activities; and owns and/or stores tens-of-millions of dollars of assets in New Jersey.

21.     EWK Airport is one of United's largest international hubs and includes United's catering operations which is one of United's largest catering operation in its worldwide operation.  For purposes of this pleading, United's EWK Airport catering operations will be referenced, at times, as "UA EWK Catering."

22.     At UA EWK Catering, United utilizes more than 1000 catering employees responsible for preparing (at peak times) more than 45,000, and 600 shelf stable, meals per day which are served by flight attendants to United passengers (including employees of the U.S. Military) on flights leaving from EWK Airport.

23.     Upon information and belief, there are numerous complaints presently pending against UA EWK Catering, including multiple complaints filed with the FDA and an OSHA complaint.

24.     Upon information and belief, UA EWK Catering was recently restricted materially in its operation by local and regional officials based upon the discovery of conditions in violation of food safety

laws, rules, codes, and/or regulations, conditions which created a significant risk of serious bodily harm, sickness, and potentially death, to workers in the facility as well as to United's passengers. Upon information and belief, the conditions which resulted in the recent closure of UA EWK Catering including unsafe practices and conditions which existed during Lee's tenure at United, and which resulted in Lee's constructive discharge from employment after she made appropriate reports of those conditions.

**Facts Concerning The Other Defendants**

25.    During the relevant time period, Jimmy Samartzis ("Samartzis") was United's *Vice President of Catering Operations* and was based out of United's corporate offices in Chicago. Samartzis is a member of United's upper management.

26.    During the relevant time period, Hermès Pineda ("Pineda") was United's *Managing Director of HR & ER Field Operations* and was based out of United's corporate offices in Chicago. Pineda is a member of United's upper management.

27.    Commencing in or about October 2016 and continuing thereafter through to the date of this pleading, Alisia Atwater ("Atwater") was United's *Director of Regulatory Compliance – Food Safety* and was based out of United's offices in Chicago. Atwater is a member of United's upper management.

28.    Upon information and belief, Atwater is also a religious person who looks down upon, and discriminates against, persons whom she believes "need religion," "need Jesus," and/or otherwise fail in her mind to have religious or spiritual beliefs aligned with those she holds.

29.    Upon information and belief, Atwater also is a homophobe who looks down upon, and discriminates against, persons whom she perceived (rightly or wrongly) to be gay and/or otherwise having a non-traditional sexual orientation.

30.    Upon information and belief, based upon her belief that Moya and Mosby were

6

homosexuals, Atwater unlawfully discriminated and retaliated against each of them, with the knowledge and support of United's other upper management employees, including but not limited to Samartzis and Pineda.

31.     At relevant times hereto, Samartzis, Pineda, and Atwater were and remained senior management level employees who controlled Lee's workplace and supervise Lee.  They each: (1) aided United in performing a wrongful act that caused Plaintiff to suffer injuries; (2) were generally aware of their role as part of an illegal or tortious activity at the time they provided assistance; and (3) knowingly and substantially assisted United in the principal violation of the statutes referenced in this Complaint.

32.     During the relevant time period, JOHN DOES I-V and JANES DOES I-V are currently unknown employees who were either senior management level employees who controlled Plaintiff's workplace and supervised Plaintiff and aided and/or abetted in the commission of conduct complained of in this Complaint and/or who acted within the scope of their employment at the workplace, or, to the extent they went beyond the scope of their employment, Defendants ratified, embraced and added to their conduct. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual employees by name.

33.     During the relevant time period, XYZ Corporations I-V were unknown affiliated corporations or entities or other corporations who have liability for the claims set forth in this Complaint. As the parties engage in discovery, Plaintiff retains the right to amend the Complaint to add these individual entities by name.

34.     All defendants are thus subject to suit under the statutes pled above.

35.     At all times referenced in this Complaint, employees of the individual defendants referred to in this Complaint were acting within the scope of their respective employment or the entity defendants ratified, embraced and added to their conduct to the extent that their actions went beyond the scope of their employment.

**Other Actors Relevant to This Dispute**

36.     Commencing in or about February 2017 and continuing at all times relevant hereto, Eliot R. Mosby ("Mosby") was hired by United as its *Managing Director – GM Catering Operation (EWK and EWR)*.

37.     Upon information and belief, Mosby is a resident of Wood Ridge, New Jersey who, like Lee, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result, and who suffered unlawful discrimination by United, including retaliation in the form of being stripped of job duties and being transferred to Chicago – away from the food safety problems existing at UA EWK Catering.

38.     On Friday September 9, 2018, Mosby commenced a plenary action in this Court against United, Gmunder, Pineda and others, asserting claims and causes of action under CEPA and the LAD (the "Mosby Lawsuit").

39.     Upon information and belief, the transactions and occurrences alleged in the Mosby Lawsuit are substantially similar to, and overlapping with, those alleged here.

40.     Commencing in or about June 2016, Gustavo A. Moya, Jr. ("Moya"), was hired by United as a *Training Manager* employed at UA EWK Catering and, thereafter, was promoted to *Level 4 Food Safety Manager*.

41.     Upon information and belief, prior to the time when he began experiencing unlawful discrimination and retaliation at United, Moya was considered to be a highly-valued United employee who routinely achieve the highest personnel review ratings, in sum and substance, of "meets expectations" and/or "exceeds expectations."

42.     Moya also was the most-knowledgeable, most-competent food safety manager at UA EWK Catering, a fact which was apparent to Plaintiff through her professional interactions with Moya both

before and during her employment with United.

43.     Moya is a resident of West New York, New Jersey who, like Lee and Mosby, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result, and who suffered unlawful discrimination by United, including retaliation in the form of being stripped of job duties and being told that he was being transferred to Chicago – away from the food safety problems existing at UA EWK Catering.

44.     Upon information and belief, at times relevant to this Complaint, Mike Landers ("Landers") was employed by United as its *Managing Director Global Catering Operations*, which included responsibility for UA EWK Catering.  Upon information and belief, Landers is a resident of Indiana who, like Lee, Mosby and Moya, reported serious wrongdoing to United regarding its food safety practices and suffered unlawful retaliation as a result.

## **FACTUAL ALLEGATIONS**

45.     Plaintiff was a respected public sector employee who worked supervising food safety inspections and food safety compliance in various industries, including the airline industry.  Plaintiff was happily employed with the State of Massachusetts, was receiving a compensation and benefits package she valued, and enjoyed the stability of her career to support herself and her daughter as a single mother.

46.     In or about December 2016, Plaintiff was assigned by to oversee food safety issues involving United, including but not limited to United's catering operations at UA EWK Catering.

47.     During and in connection with that public sector assignment, Plaintiff discovered numerous food safety issues which needed to be addressed and remedied by United, as quickly as possible, in order to avoid the risk of potential food poisoning likely to be caused to United passengers.

48.     Plaintiff made her concerns known to United by reporting them to United's responsible upper management employee(s), in order to protect the flying public from actual or potential food safety

harm.

49.     United appeared to respond positively to Plaintiff's efforts to guide United into compliance with federal, state and local mandated food safety practices and sought to hire Plaintiff as a United employee for purposes of effectuating compliance.

50.     United represented to Plaintiff that United had a sincere interest in curing its food safety non-compliance issues and represented to Plaintiff that if she took United's employment offer, Plaintiff would become a key member of United's team to identify, correct, and resolve food safety issues, including particularly the food safety issues impacting UA EWK Catering.

51.     Upon information and belief, at the time United was making those representations to Plaintiff, United knew that those representations were materially false, misleading, and were being made to Plaintiff for the purpose of inducing her reliance in making her decision to become an employee of United.

52.     But for those representations from United, which Plaintiff materially and reasonably relied upon as truthful, Plaintiff would not have resigned from her public sector employment to join United.

53.     Based upon United's promises and representations to her, Plaintiff resigned from her public sector employment and accepted United's offer to become United's *Senior Manager of Food Safety* effective March 22, 2017.

54.     In connection with that employment, United agreed to provide Plaintiff with the following compensation and benefits:  (1) about $3,000 per week, or $144,000 per annum, in salary; (2) Restricted Stock grants; (3) a 401K with employer matching contributions; (4) annual bonus payouts that can be as high as 150% of salary; (5) high-end healthcare insurance benefits; (6) lifetime flight benefits for herself, her parents and her daughter; and (7) other valuable benefits, perks, and compensation.

55.     Immediately prior to the time she was hired by United, Plaintiff was a highly respected

public sector food safety inspector. She was required to put her comfortable home up for sale for relotation (an invest significant monies in the house, as mandated by the relocation company, before it would list it), and give up her lifestyle and stable career in Massachusetts to accept United's offer to serve as United's *Senior Manager of Food Safety* at the UA EWK Catering operation.

56.     When United recruited Plaintiff to join United, no one disclosed to Plaintiff that United was materially resistant to adopting and maintaining safe food processing and safe food handling practices, and/or that United was materially resistant to achieving good faith compliance with applicable federal, state, and local laws, codes, rules, and regulations including compliance with FDA reporting requirements.

57.     Throughout her association with United, Plaintiff disclosed to United (including Atwater) conditions, practices, and circumstances within UA EWK Catering that Plaintiff reasonably believed to be violations of applicable federal, state and/or local food safety law, rules, codes, and/or regulations.

**The Jyoti Incident**

58.     For example, in or about February 2017, at or about the time when Mosby joined United, during routine product food safety sampling at UA EWK Catering, sample results tested by an independent lab came back unsatisfactory for food safety purposes for one of United's key outside prepared-meal vendors, Jyoti Natural Foods, Inc. ("Jyoti").

59.     Together with Moya, Plaintiff (at the time not yet hired by United) inspected the facility at issue and provided United with guidance as to the material manner in which the facility was in violation of food safety law, rules, codes, regulations, and/or standards because it was unsanitary, improperly equipped, and unable to operate in compliance due to unfinished facilities renovation / construction.

60.     The issues identified by Moya and Plaintiff demonstrated a material possibility that unsafe food from Jyoti, contaminated with harmful, potentially fatal bacteria, could imminently be placed into the food supply chain for United's passengers flying out of Newark.

11

61.     Upon information and belief, Moya reported the problem to Atwater and/or others in upper management at United, whereupon Atwater was resistant to taking corrective action despite the serious food safety risks presented.

62.     In violation of the spirit if not also the letter of food safety law, rules, codes, regulations and/or safe practices, Atwater initiated a plan to disguise and/or hide the material food safety risks at issue by alerting Jyoti to the fact that Moya was being sent over to conduct swabbing of microbiological niches, so that Jyoti could attempt to deep clean the facility to obscure unsafe food handling conditions.

63.     Upon information and belief, prior to Moya's arrival at Jyoti for that second round of sampling, Atwater advised Jyoti that Moya was coming for the purpose of enabling Jyoti could clean the facility with bleach before Moya arrived, in an effort to hide the problematic unsanitary and unsafe conditions impacting the food was providing to United.

64.     Upon information and belief, based upon his discovery during the second inspection at Jyoti that Jyoti had undertaken efforts to disguise and/or hide its food safety problems from Moya by destroying evidence through the bleach cleaning, and his ongoing concerns that Jyoti's unsanitary and unsafe practices threatened to cause serious harm to United's passengers, Moya determined that it was necessary for United to terminate its vendor-vendee relationship with Jyoti.

65.     Upon information and belief, when Moya attempted to have United proceed with the termination of Jyoti, Atwater actively interfered with the termination and sought to block it from occurring, in contradiction to the best interests of United's passengers likely to suffer food poisoning from if/when tainted Jyoti food was served on United flights.

66.     Upon information and belief, ultimately Jyoti's vendor-vendee relationship with United was terminated due to Moya's efforts, despite Atwater's reckless and improper efforts to stop that from occurring.

67.      In advance of Plaintiff's decision to come to work for United, United intentionally failed

to disclose those relevant facts to Plaintiff due to its graphic demonstration that United's intentions as to food safety were disingenuous and not aligned with those of Plaintiff, aligned with the representations United made to Plaintiff for purposes of soliciting her to join United as an employee, and/or aligned with what applicable law, rules, codes, and/or regulations required of United meal service to passengers.

68.     Had United truthfully disclosed to Plaintiff the facts and circumstances of the Jyoti incident, the 2016 Denver, Colorado "Journey Cuisine" incident, and United's true intentions regarding food safety, Plaintiff would not have accepted employment with United; would never have started the relocation process; and, instead, would have continued her successful public sector employment.

### Lee's Employment With United

69.     Upon Plaintiff's commencement of employment with United on March 22, 2017, Plaintiff was assigned to work under Atwater (Plaintiff's supervisor) and to work with Moya for the purported purpose of identifying and resolving United's food safety compliance issues.

70.     Initially, Atwater repeatedly professed to Plaintiff that Plaintiff was a "valued member" on the United team, and that United was lucky to have Plaintiff in it employ.  Atwater praised Plaintiff for the work Plaintiff was performing as a United employee, including but not limited to work Plaintiff performed which impacted UA EWK Catering.

71.     Atwater's attitude towards Plaintiff materially changed, however, when Plaintiff declined to participate in activities involving unlawful discrimination against Moya based upon Atwater's perception that he was "gay."

72.     Plaintiff was involved in a meeting with Atwater and Moya in or about March 2, 2017, in New Jersey to discuss UA EWK Catering and its food safety issues, which were material.

73.     After Moya was excused from the meeting, Atwater continued to meet with Plaintiff during which meeting Atwater advised Plaintiff, in expressed language, that Atwater did not approve of

Moya's homosexual "lifestyle"; and communicated to Plaintiff that she (Atwater) took exception to what she perceived to be Moya's flamboyant personality.

74.     Thereafter, in another meeting with Atwater, in reference to Moya's sexual orientation, Atwater advised Plaintiff of Atwater's opinion that Moya needed to "find God" and/or "find Jesus", referencing Atwater's apparent belief that God could cure Moya of his sexual orientation, and that Moya was a sinner due to his sexual orientation.

75.     Atwater instructed Plaintiff to fire Moya.

76.     Plaintiff refused based upon Plaintiff's perception that Moya was a highly-valued United employee and was United's most knowledgeable food safety manager for regulatory compliance at UA EWK Catering.

77.     In connection with Plaintiff's employee-personnel review of Moya, Atwater directed Plaintiff to purposefully deflate her ratings of Moya by reporting, in sum and substance, that Moya "failed to meet expectations."

78.     Plaintiff refused based upon Plaintiff's perception that Moya's job performance easily qualified at the level of "meets expectations," if not higher.

79.     Plaintiff perceived that Atwater was directing Plaintiff to single out and mistreat Moya, in connection with his United employment, due to his sexual orientation as well as his reports of food safety violations occurring at UA EWK Catering, including but not limited to the Jyoti incident.  Based upon those perceptions, in a meeting in which they were discussing Moya, Plaintiff communicated to Atwater that Plaintiff would not engage in such behaviors, whereupon Atwater became belligerent and screamed at Plaintiff for her refusal to engage in those unlawful actions.

80.     Thereafter, in another meeting with Atwater, Plaintiff advised Atwater that United needed to stop using food-vendor-sources (like Jyoti) with adverse observations (e.g. unsanitary or inappropriate condition, and/or positive tests for food-borne pathogen) made during or as a result of inspections United

conducted.

81.     Atwater rejected Plaintiff's suggestion, advising Plaintiff in sum and substance that Plaintiff should not perform her food safety job duties in a manner that exposed United to criticism or potential operational disruption, regardless of the health risks that might present to United's passengers.

82.     Atwater then commenced unlawful retaliation against Plaintiff, for the intended purpose of forcing Plaintiff out of her job at United through constructive discharge.

83.     For example, Atwater required Plaintiff to commence an immediate inspection tour of United food catering operations throughout the United States, knowing that many of the subject operations could have been monitored by other means and the inspections were unnecessary at the time.

84.     Upon information and belief, Atwater direction to Plaintiff to do that was purposeful harassment intended by Atwater to impose physical challenges upon Plaintiff that would likely cause her emotional stress and exacerbate physical limitations and disabilities which Atwater knew Plaintiff to be suffering from.

85.     Atwaters's plan to harass Plaintiff in that manner had its intended impact upon Plaintiff's health and well-being.  Atwater's forced-march-exhaustion-schedule imposed upon Plaintiff resulting in Plaintiff having to be hospitalized on or about June 29, 2017, when Plaintiff was treated for spiking blood pressure and physical exhaustion due to Atwater's harassment.

86.     During her inspection of United's catering operation in Denver, Colorado, Plaintiff discover materially improper food safety practices which created a serious, imminent risk of an outbreak of listeria monocytogenes, which can be deadly.

87.     Plaintiff reported the problem to Atwater and others within United, whereupon Atwater criticized Plaintiff for making the report telling Plaintiff that she was "not corporate minded enough" due to Plaintiff's efforts to secure United's compliance, at the Denver facility, with the applicable federal, state, and local laws, rules, codes, and regulations United was violating that caused those unsafe conditions to

15

occur and persist, uncorrected.

88.     Rather than take the required, appropriate corrective action, Atwater did not proceed with any action until recurring positive listeria monocytogenes testing occurred resulting in United's intentional failure to make timely disclosure to the FDA; and following that Atwater had United engage in an effort to cover-up the horrific conditions existing at the Denver facility by having that facility engage in a "deep cleaning" immediately prior to the FDA's anticipated emergency health inspection of the facility.

89.     Upon information and belief, Atwater's "deep cleaning" was undertaken for the purpose of hiding the food safety issues from the FDA and to unlawfully mislead the FDA regarding the unsafe conditions existing and persisting at the Denver Facility.

90.     After the FDA completed its inspection process, United's Denver facility was closed by the FDA due to unsafe food conditions and, thereafter, the facility remained closed for many months while United was forced by the FDA to take corrective action in line with that which Plaintiff had reported to United to be required.

91.     Due to Plaintiff's reports of unsafe conditions, unlawful practices, and other matters of serious public policy concern, Atwater sought to force Plaintiff to immediately transfer to United's offices in Chicago (hereinafter, the "Chicago Transfer Harassment").

92.     United has a pattern and practice of retaliation against and harassment of responsible employees like Plaintiff, Mosby, and Moya, through the Chicago Transfer Harassment.

93.     United's practice through the Chicago Transfer Harassment is to effectively strip the employee of their original, legitimate job duties and responsibilities resulting in reports requiring corrective action; reassigning the employee to report to a building in Chicago without any assignment to an office or work area commensurate with the employee's pre-transfer assignment; pepper the employee with demeaning, make-work assignments; and isolate the employee away from family and friends they would see on a daily basis before the transfer went into effect.

16

94.     Upon information and belief, United recently utilized the Chicago Transfer Harassment against Mosby; is in the process of attempting to utilize the practice in connection with Moya; and was attempting to force Plaintiff to be transferred in that manner in retaliation for Plaintiff's lawful, protected, conduct and reports.

95.     In fact, pursuant to United's published employee personnel policies, Plaintiff was allowed one-year to organize and effectuate her transfer to Chicago, and Atwater was unlawfully harassing Plaintiff for Plaintiff's proper refusal to immediately relocate, which Plaintiff was unable to do because of family issues (her daughter in school) and financial constraints (unable to sell her house in Massachusetts).

96.     As of August 2017, still operating under the Atwater forced-march-exhaustion-schedule, Plaintiff and Atwater met in Houston, Texas, where United had a food service catering operation impacted by Hurricane Harvey (the "Houston Facility").

97.     Plaintiff had discovered and reported to Atwater and others in United's upper management serious, unlawful food safety issues impacting the Houston Facility.

98.     In response to those reports, Atwater falsely accused Plaintiff is driving cars without any valid driver's license and threatened that United would continue to "investigate" Plaintiff.   Upon information and belief, that investigation by United was for the purpose of digging up dirt and serious wrongful conduct about Plaintiff that United could utilize against her, in retaliation for Plaintiff's protected acts and conduct.

99.     United created and imposed a hostile work environment upon Plaintiff, in violation of Plaintiff's protected rights and interests under the LAD and under CEPA by and through: (a) the forced-march-exhaustion-schedule; (b) pressuring Plaintiff to relocate immediately in violation of United's published policies; (c) withhold significant monies due and owed to Plaintiff for reimbursement of company travel expense for the purpose of imposing financial hardship upon Plaintiff, a single mother; (d) investigating Plaintiff for the purpose of digging dirt and making fabricated allegations against her of

17

improper employee conduct; and (e) other actions and omission directed at Plaintiff unlawfully.

100.     In late August 2017, upon arriving in Maine for a break from the Atwater forced-march-exhaustion-schedule, Plaintiff was presented with a lab report demonstrating a positive listeria species in the food at UA EWK Catering.

101.     As she was required to do under applicable FDA regulations, Plaintiff immediately checked to make sure that her senior food safety manager (Moya) had sent it out the positive sample for verification, which Moya confirmed he had done.

102.     As she was required to do under applicable FDA regulations, Plaintiff then immediately commenced working with Moya to put the potentially tainted food products "on hold" so that they would not be disbursed into the food chain given to United's passengers flying out of Newark.

103.     Moya created a global internal United alert and, as required under applicable FDA regulation, sent the alert out within United to keep the tainted food out of the food supply unless and until the proper testing was completed to avoid a possible outbreak of Listeria Monocytogenes, which can be deadly.

104.     United's upper management resisted keeping the food on hold due to business concerns, and advised Plaintiff, in sum and substance, that United was going to intentionally delay making mandatory reports to the FDA concerning the situation.

105.     Plaintiff advised United that the failure to immediately make those reports was a serious violation of applicable federal, state, and local laws, regulations, codes, and rules.

106.     As United's Senior Manager of Food Safety, Plaintiff faced serious, significant, criminal and civil liability exposure if United's failure to make those timely reports to the FDA resulted in infecting United passenger with a food borne pathogen.

107.     Atwater directed Plaintiff to stand down and directed Plaintiff that she could not make the necessary report to the FDA immediately.

108.    United was fully aware of the situation and was choosing, intentionally, to violate FDA regulations and needlessly put passengers at risk of serious harm and, potentially, even death.

109.    United was aware that if Plaintiff permitted that to occur, Plaintiff would be committing what amounted to a criminal omission, at risking jail and fines  under the *Park Doctrine*, imposed by United States v. Park, 421 U.S. 658 (1975).

110.    By and through its refusal to take the required corrective action immediately, United was forcing Plaintiff to either participate in serious criminal and/or civil wrongdoing, or to resign involuntarily.

111.    United's acts and omissions through Atwater and the other upper-management employees involved, were unlawful, improper, in violation of Plaintiff's protected rights and interests, and committed intentionally, in bad faith.

112.    Plaintiff was then forced to tender her resignation, effective immediately.

113.    On September 11, 2017, at a meeting held in Newark, New Jersey, United advised Plaintiff that her involuntary resignation was accepted by United; that Plaintiff's last day on the job would be September 11, 2017, and that Plaintiff's employment would terminate effect on or about September 25, 2017, the last day she would be paid by United.

114.    Effective on or about September 26, 2017, Plaintiff became involuntarily unemployed, leaving Plaintiff injury emotionally, professionally, and financially.  Since that time, Plaintiff's efforts to find equivalent employment have been unsuccessful, and Plaintiff has been seriously constrained in her ability to financially support herself and her daughter.

115.    In or about August 2018, due to United's continuing intentional failure and refusal to correct food safety violations at UA EWK Catering (where the listeria was found and reported to Plaintiff a year earlier), local health department officials shuttered UA EWK Catering due to numerous, improper, harmful food safety practices, facilities issues, and compliance failures by United.

116.    Each of the aforementioned actions by the defendants were for the purpose of unlawfully

19

retaliation, unlawful discrimination, and/or material breach of contract, against Plaintiff.

117.     United unreasonably failed to provide adequate, supervision, training, control, monitoring, and/or investigation of Atwater and/or its other, involved, upper management personnel, each of whom were committing intentional, unlawful acts and omissions against Plaintiff, on behalf of United.

118.     As a direct and proximate result and consequence of the defendants' wrongful and unlawful acts, actions and omissions which resulted in the involuntary termination of Plaintiff's employment as of September 2017, Plaintiff has suffered and is continuing to suffer serious emotional distress, related physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for herself, her parents, and her dependents), loss of insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

## FIRST COUNT

### (New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.)

119.     Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

120.     Plaintiff complained about, objected to and refused to participate in illegal and unethical conduct by Defendants.

121.     Plaintiff reported the substandard and unsafe food safety conditions and participated in her coworkers' disclosure of those unlawful and illegal acts and omissions to appropriate regulatory authorities, including but not limited to the FDA.

122.     Thereafter, defendants retaliated against Plaintiff because of her valid complaints of illegal and unethical conduct and refusal to participate in such illegal and unethical conduct, including but not limited to all of the forms of unlawful retaliation stated previously in this pleading.

123.     As a direct and proximate result of the acts and omissions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other

emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy her life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

124.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.


## SECOND COUNT

### (New Jersey Law Against Discrimination)

125.    Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

126.    Plaintiff is a member of several protected classes under the New Jersey Law Against

Discrimination, N.J.S.A. 10:5-1 et seq. ("LAD") based upon her race, disabilities, and religious faith and upbringing.

127.    Defendant United Airlines is an "employer" as defined under the LAD.

128.    The defendant unlawfully discriminated against, harassed, and abused Plaintiff as a result of her protected statuses and/or perceived protected statuses.

129.    For example, when Atwater learned that Plaintiff was mixed Jewish-Catholic in her religious heritage and orientation, and that Plaintiff was observant of significant religious holidays for both of those faiths, Atwater expressed distain and contempt towards Plaintiff and directed mistreatment at Plaintiff for her observance of Jewish traditions, holidays, and faith.

130.    On numerous occasions Atwater chided Plaintiff that she (Plaintiff) "needed Jesus," and intruded into Plaintiff's privacy by questioning Plaintiff about her attendance at church.

131.    Atwater was informed that Plaintiff suffered from dyslexia, back injuries, high blood pressure, and stress; rather than provide Plaintiff with the reasonable accommodations she requested, Atwater intentionally pressured Plaintiff with unreasonable travel and other unnecessary work-related demands for purposes of exacerbating Plaintiff's conditions so Plaintiff would be forced to resign from United.

132.    Atwater, who was African-American, openly and publicly characterized herself as a person suffering from "angry black woman syndrome" and routinely evidenced unlawful contempt towards Plaintiff based upon the fact that Plaintiff is not African-American.

133.    Upon information and belief, as of April 2017 United received numerous reports identifying acts by Atwater which were inappropriate, improper, and/or unlawful under the LAD, Title VII and/or other civil rights laws, rules and regulations.

134.    Upon information and belief, through its upper management, as of April 2017 United knew of Atwater's predisposition to acting in a discriminatory manner; of her predisposition to make

insensitive and inappropriate remarks to and about people concerning their protected characteristics; and of her particular insensitivity to persons she perceived to be less religious than herself, based upon the other persons faith, lifestyle, sexual identity and/or sexual orientation.

135.    United failed to take appropriate corrective action as to Atwater, instead permitting her to continue with her unlawful, upper management conduct in violation of the LAD.

136.    In violation of their obligations under LAD, Defendants' Human Resources staff failed to take appropriate action to protect Plaintiff, to discipline the other defendants, and/or other unlawful acts and omissions.

137.    The foregoing facts and circumstances demonstrate that the defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by discriminating against Plaintiff.

138.    As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy her life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

139.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

23

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

## THIRD COUNT

### (New Jersey Law Against Discrimination - Retaliation)

140.    Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

141.    The foregoing facts and circumstances demonstrate that defendants have violated the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq., by retaliating against Plaintiff for engaging in the protected activity of refusing to take inappropriate employment action against Moya.

142.    As a direct and proximate result of the actions of the defendants, Plaintiff has suffered mental anguish, physical discomfort, pain and suffering, shame and embarrassment and other emotional distress injuries. Furthermore, Plaintiff has suffered reputational harm, a diminished ability to earn a living and a diminished capacity to enjoy her life.  Moreover, Plaintiff has and/or may have to incur expenses for medical, psychiatric and/or psychological counseling and care. Plaintiff's damages have been experienced in the past and present, and they will continue into the future.

143.    Further, Plaintiff has been required to retain an attorney to assist Plaintiff in asserting Plaintiff's claims and protecting Plaintiff's rights.

**WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

24

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.  Such other, further and different relief as the Court deems fitting, just and proper.

## FOURTH COUNT

### (Material Contract Breach)

144.    Plaintiff realleges and incorporates herein all prior paragraphs set forth in this Complaint.

145.    Plaintiff and United were parties to a binding employment agreement, supported by good and valuable consideration (the "Agreement").

146.    The Agreement included an obligation that United render its contractual performance in good faith, and in a manner that would neither interfere, hamper, nor deny Plaintiff the performances she bargained to receive.

147.    Plaintiff rendered material performance of any and all obligations she had under the Agreement, and had discharged or otherwise satisfied any and all conditions precedent to her entitlement to United's full and complete, good faith performances under the Agreement.

25

148.   United material breached the Agreement by and through its acts and omissions, including but not limited to the following: (a) United forced Plaintiff to involuntarily resign from employment with United; (b) United unlawfully harassed, retaliated against, and discriminated against Plaintiff for purposes of interfering with, hampering, and/or denying Plaintiff the performances she bargained to receive.

149.   As a direct and proximate result and consequence of the defendants' wrongful and unlawful acts, actions and omissions which resulted in the involuntary termination of Plaintiff's employment as of September 2017, Plaintiff has suffered and is continuing to suffer serious emotional distress, related physical harm, financial loss, economic loss, loss of employment benefits, loss of employment perks (including life-time free air travel for herself, her parents, and her dependents), loss of insurance and/or degradation of insurance coverage, and other harm and loss which is serious and severe.

**WHEREFORE**, Plaintiff demands judgment in his favor, and Counts against each and every one of the defendants, jointly and severally, awarding Plaintiff the following:

A.  Compensatory damages;

B.  Damages for lost wages and benefits (including health, dental and prescription care benefits coverage), back pay, front pay, inclusive of annual merit increases, restricted stock grants and bonus payouts, as well as all fringe benefits and flight/parking benefits to which Plaintiff was entitled to receive from United;

C.  Damages for humiliation, mental and emotional distress;

D.  Statutory damages;

E.  Punitive damages and liquidated damages;

F.  Attorneys' fees and costs of suit;

G.  Lawful interest – including pre-judgment interest on lost wages;

H.  Lawful interest – including pre-judgment interest on any wages not paid in a timely manner; and

I.   Such other, further and different relief as the Court deems fitting, just and proper.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Marcia Lee

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2018


## **JURY DEMAND**

Plaintiff demands a trial by jury as to all issues.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Marcia Lee

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2018


## **DESIGNATION OF TRIAL COUNSEL**

Please take notice that pursuant to R. 4:25-4, Christopher L. Deininger, Esq. is

hereby designated as trial counsel in the within matter.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Marcia Lee

By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2018

## <u>CERTIFICATION PURSUANT TO RULE 4:5-1</u>

The undersigned, Christopher L. Deininger, Esq., certifies on behalf of the Plaintiff as follows:

1.      I am an attorney admitted to practice law in the State of New Jersey, counsel for the above-named Plaintiff in the subject action.

2.      The matter in controversy in this case is not, to my knowledge, the subject of any other action pending in any Court or pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated.

3.      There are no other parties who should be joined in this action that we are aware of at the present time.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**DEININGER & ASSOCIATES, LLP**
Attorneys for Marcia Lee


By : _____
CHRISTOPHER L. DEININGER, ESQ.

Dated: September 12, 2018